```
          IN THE UNITED STATES DISTRICT COURT
              WESTERN DISTRICT OF ARKANSAS
                  FAYETTEVILLE DIVISION
```

DAVID DANIELS                                              PLAINTIFF

       v.          Civil No. 06-5205

SHERIFF KEITH FERGUSON;
CAPTAIN PETRAY; LT. CARTER;
SGT. FAULKENBURY; SGT. NANCE;
and SGT. TOMLIN                                            DEFENDANTS

## O R D E R

Now on this 17th day of July 2008, come on for consideration the following:

    \*    defendants' **Motion For Summary Judgment** (document #43);

    \*    the **Report And Recommendation Of The Magistrate Judge** ("R&R") (document #56);

    \*    plaintiff's **Motion To Sue Defendants In Both Capacity's [sic]** (document #60); and

    \*    plaintiff's **Objections To Recommendations Of Summery [sic] Judgment By Defendant** (document #61),

and the Court, being well and sufficiently advised, finds and orders as follows:

1. Plaintiff's Complaint in this matter centers on his allegation that while he was incarcerated at the Benton County Detention Center ("BCDC") he was kept on "lock down" from January 10, 2006, until April, 2007, on various trumped-up charges, with

no notice, no hearing, and no right to appeal.  He further alleges that while on lock down he was denied showers, visits, and phone calls, as well as a sleeping mat and tennis shoes that had been prescribed because of back pain.

2.   Defendants moved for summary judgment.  The Magistrate Judge, to assist plaintiff -- who is *pro se* -- in responding, furnished him with a questionnaire addressing the various issues in his case.   After plaintiff returned this document, the Magistrate Judge made his Report And Recommendation ("R&R") to the Court.  In it, he noted that he had construed the Complaint to be asserted against the defendants in both their individual and official capacities.  There is no objection to this aspect of the R&R, and the Court will grant plaintiff's motion to amend his Complaint.

3.   The Magistrate Judge analyzed plaintiff's claims under the standard applicable to a pretrial detainee, a more lenient standard than that applicable to a convicted prisoner, because it was unclear when, in the course of the events alleged, plailntiff was convicted and his status changed.

It is axiomatic that a pretrial detainee may not be punished for the crime of which he stands accused.  He may, however, be required to abide by the conditions and restrictions of his confinement, to the extent those conditions and restrictions are reasonably related to a legitimate governmental objective, under

the Supreme Court's decision in **Bell v. Wolfish**, **441 U.S. 520 (1979).**

Implicit in the R&R is the finding that plaintiff was placed in lock down as punishment for infractions of legitimate prison rules, rather than for the crime of which he was accused.  The Magistrate Judge reported that plaintiff was given written notice of the disciplinary violations, and an opportunity to respond.  He also reported that even if the disciplinary charges were fabricated, there was no constitutional violation because a prisoner does not have a constitutional guarantee of freedom from false charges.  To the extent that plaintiff's privileges and his access to hygiene items, exercise, and medical care were restricted, the Magistrate Judge reported that these restrictions did not attain constitutional dimensions.  The Magistrate Judge recommended that defendants' Motion For Summary Judgment be granted, and that plaintiff's Complaint be dismissed with prejudice.

    4.   Plaintiff makes the following objections to the R&R:

(a)  that he was not given notice or a hearing with regard to any disciplinary violation;

(b)  that he was placed in segregation for the crime of which he was accused, and because of his race;

(c)  that defendants took his soap, toilet paper, clean clothes, and "a hygiene shave" for "over 7 months";

  (d) that the vents in his cell did not work, leaving him without heat from January 10, 2006, to April, 2006, and without air conditioning in the summer of 2006;

  (e) that he was not allowed out of his cell for exercise for seven months, and could not exercise in his cell due to rashes where his skin rubbed;

  (f) that he was deprived of phone calls and visits for ten months;

  (g) that he has "several severe medical conditions" that were deliberately ignored by defendants; and

  (h) that 255 days in isolation is excessive, and constitutes cruel and unusual punishment.

  5. Summary judgment should be granted when the record, viewed in the light most favorable to the nonmoving party, and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. **Walsh v. United States, 31 F.3d 696 (8th Cir. 1994).** Summary judgment is not appropriate unless all the evidence points toward one conclusion and is susceptible of no reasonable inferences sustaining the position of the nonmoving party. **Hardin v. Hussmann Corp., 45 F.3d 262 (8th Cir. 1995).** The burden is on the moving party to demonstrate the non-existence of a genuine factual dispute; however, once the moving party has met that burden, the nonmoving party cannot rest

-4-

on its pleadings, but must come forward with facts showing the existence of a genuine dispute. **City of Mt. Pleasant, Iowa v. Associated Electric Co-op**, 838 F.2d 268 (8th Cir. 1988).

 6. Plaintiff first objects that he was never given notice or a hearing with regard to any disciplinary violation. Due process in prison disciplinary proceedings requires twenty-four hours "advance written notice of the claimed violation and a written statement of the factfinders as to the evidence relied upon and the reasons for the disciplinary action taken." **Wolff v. McDonnell**, 418 U.S. 539, 563 (1974).

 The evidence with regard to whether plaintiff was given notice or a hearing as to his many disciplinary violations is as follows:

 \* According to the Benton County Sheriff's Office County Jail Policy & Procedures (the "Policy"), any violation of BCDC rules that warrants more than a verbal reprimand is to be documented on an inmate disciplinary action form ("IDAF"), and an incident report is to be generated. These documents are forwarded to the shift supervisor, who forwards them to the Jail Lieutenant for "review and final disposition." The jail commander or his designee then reviews all disciplinary action taken, and copies of the reports are placed in the inmate's file.

 \* While the Policy does not set forth any requirement that the IDAF be served on the inmate, the IDAF itself has a place to

-5-

indicate "DATE AND TIME CHARGES SERVED." This information was filled in on almost all of plaintiff's disciplinaries.

    \* One IDAF, dated 9/23/06, did not show any action taken, and included the notation "not served in time."

    \* A comparison of the information written in the space marked "DETAILS OF HEARING, WITNESS(ES), RESPONSE OF INMATE (USE REVERSE IF ADDITIONAL SPACE IS REQUIRED)" with information supplied by plaintiff in his Response To Summary Judgment Motion indicates that plaintiff was actually heard in response to at least one of his disciplinaries. The IDAF dated May 14, 2006, at first listed the offense as "conduct which disrupts or interferes with the security or orderly running of operations in the jail." This is crossed out and "fighting," is written in. The "RESPONSE OF INMATE" is noted as "there was no fight at all." The Hearing Deputy was Sgt. Nance. In his Response To Summary Judgment Motion, plaintiff states with regard to this IDAF, "[t]here was no fight, Sgt. Nance changed the disciplinary to fighting!" In addition, in his Response To Summary Judgment Motion, plaintiff admits receiving written notice and a hearing with regard to this IDAF.

    \* Some notations on the IDAFs contain details that the Court believes could only have come from plaintiff. They are too particularized to his allegations to have been concocted. For example, the IDAF of May 17, 2006, notes that plaintiff "stated

Cpl. Tomlin is out to get him along with other Deputies. He stated Tomlin has even hid his PRN meds from him and did it just the other day at 5 a.m. He stated he is having problems with these people since he got here." On the IDAF dated November 25, 2006, the "RESPONSE OF INMATE" is "[t]hat bed roll ain't mine!" and "[p]ut it in there that I said, 'Tomlin's up to his old tricks again'."

   *   In his Response To Summary Judgment Motion, plaintiff acknowledges that he appealed nine of his disciplinaries.

   *   Two disciplinaries dated 9/6/06 were reversed on appeal.

When the foregoing is considered, the Court believes there can be no dispute that plaintiff was given notice of his disciplinaries. The IDAFs so indicate, and in one case where the IDAF was not served in time, no further action was taken. Plaintiff appealed many of the disciplinaries, which he could not have done without knowing about them. The notations with regard to plaintiff's responses are -- at least in some instances -- consistent with his recollection of the incidents or with his assertions in this case. This objection will, therefore, be overruled.

   7.   Plaintiff objects that he was placed in lock down for the crime of which he was accused, and because of his race. He offers no evidence that would support this objection, and there is a great deal of evidence to the contrary. A review of the IDAFs

-7-

reflects that plaintiff was repeatedly in defiance of jail rules dealing with inmate dress, hoarding and trading food, possession of unauthorized items, and similar conduct.  Each lock down is explained by conduct violating BCDC rules.  In the absence of some evidence to the contrary, this objection is without merit and will be overruled.

    8.   Plaintiff objects that defendants took his soap, toilet paper, clean clothes, and "a hygiene shave" for "over 7 months," contending that this is cruel and unusual punishment.  He offers as evidence an Incident Report where a cellmate asked to be moved because "Daniels had not taken a shower in a long time and . . . Daniels and the cell stinks."

    The Court notes, however, that plaintiff's Activity Report indicates that he was out to court appearances on 24 different occasions between December 28, 2005, and March 15, 2007.  It could hardly have gone unnoticed by his attorneys, and the judge(s) before whom he appeared, if he had not had access to soap, toilet paper, clean clothes, or a shave for several months.

    Other documents in the record also reflect that plaintiff was not deprived of these hygiene items. He received a disciplinary on May 16, 2006, for disobeying the order of a deputy. The IDAF reflects that after getting a "court shave," he went in to the shower, and was disciplined because he did not have permission to do so.  The IDAF further reflects that plaintiff claimed Deputy

Bennett told him to take a shower.

In a Grievance dated June 28, 2006, plaintiff complained that "Cpl Tomlins back at his old tricks again using new officers to put pressure on me. He made the Officer Foster take my soap-shampoo + towel, so I couldn't take a shower."

In a Grievance dated September 26, 2006, plaintiff complained "I have rashes from not taken [sic] a shower every day, I need a shower every day, lockdowns if lucky to get one every 3 days is not enough, its bad enough this facility does not have deoderant for inmates or the necessary black people care produces [sic]. . . ."

In a Grievance dated December 3, 2006, plaintiff complained about "officers getting there [sic] days mix-up [sic] for shower day so I go without one for a week or so."

The foregoing evidence -- including documents written and signed by plaintiff himself -- demonstrates that he did not go for seven months without a shower, and his frequent contact with the court system is evidence that he did not go without other hygiene items such as toilet paper for that period of time. This objection will be overruled.

9. Plaintiff objects that the vents in his cell did not work, leaving him without heat in the winter and air conditioning in the summer. The documentary evidence, however, is that plaintiff -- or someone -- covered the vents with paper. In a

Grievance dated September 27, 2006, plaintiff complained that he was given a disciplinary for "a covered vent thats been cover [sic] for a while by somebody else who was on the top bunk b/c the A/C shots [sic] right in there [sic] face. . . ."  This objection is without merit and will be overruled.

10.  Plaintiff objects that he was not allowed out of his cell for exercise for seven months, and could not exercise in his cell due to rashes where his skin rubbed. Plaintiff also complains about the BCDC taking his special shoes, apparently prescribed because of a back condition.  He contends that he needed these shoes in order to exercise.

Lack of exercise claims analyzed under the Eighth Amendment "deliberate indifference" standard indicate that lack of exercise may be a constitutional violation if an inmate's health suffers, and that a court should consider the opportunities for in-cell and out-of-cell exercise, size of the cell, and duration of confinement. **Wishon v. Gammon**, **978 F.2d 446, 449 (8th Cir. 1992)**. District Courts in this Circuit have held that an hour of exercise outside one's cell is required in order to comply with the Eighth Amendment. See **Covington v. Greenwell**, **2006 WL 3247215 (E.D. Mo. 2006)**, and cases cited therein.

Plaintiff alleges that he was locked down for 255 days, and could not exercise in his cell.  Plaintiff's BCDC Activity Report reflects rather sporadic recreational opportunities, and further

reflects that he was not out of his cell for recreation at all between June 21, 2006, and September 13, 2006, and between October 9, 2006, and March 15, 2007.  The Court finds a genuine issue of fact about whether plaintiff was deprived of the opportunity to exercise, sufficient to implicate his constitutional rights under the standards applicable to a pre-trial detainee, which are more generous than those applicable under the Eighth Amendment.  This objection will be sustained, and summary judgment will be denied as to this issue.

    11.  Plaintiff objects that he was deprived of phone calls and visits for ten months.  The phone call Detail Report covering December 28, 2005, to January 5, 2007, shows that plaintiff made or attempted numerous calls in January, February, and March of 2006.  There were only seven calls in April, 2006, none in May, two in June, and one in July.  The Detail Report shows no calls after July, 2006.

    The Policy states "<u>Telephone communications is a 'right' when an unsentenced offender is first received.</u>"  A document headed "<u>Inmate Telephone System Notice</u>" and signed by plaintiff on December 28, 2005, says BCDC "allows inmates to make calls as a privilege only."

    A notation by Captain Petray on a Grievance dated January 27, 2006, is that "Lockdowns can only use the phone for legal or bondsman calls not personal calls."  The Policy -- or that part of

it shown to the Court -- does not say anything about loss of privileges during lock downs.

Loss of privileges is a recognized disciplinary tool in incarceration. Loss of rights is a different matter. Since it is unknown when plaintiff ceased being, as the Policy rather presumptively describes it, an "unsentenced offender," and since the two written policy statements about use of the telephone are contradictory, the Court finds that a question of fact exists with regard to whether BCDC deprived plaintiff of a right to telephone communications at a time when he had not been convicted of any crime. This objection has merit, and summary judgment will be denied as to it.

As regards visitation, the Policy includes three full pages of regulations, commencing with the statement that 'Inmates are encouraged to maintain relationships with family and friends." Visitors are required to sign a "visitation log," but no such log was presented as evidence in support of or in opposition to the Motion for Summary Judgment. The Activity Report, however, shows five visits by plaintiff's attorney between December 28, 2005, and October 30, 2006, and no visits from anyone else. Giving plaintiff the favorable inferences he is due from these facts, the Court concludes that a genuine issue of material fact is made out as to whether plaintiff was unconstitutionally deprived of visitation. This objection has merit, and summary judgment will

be denied as to this issue.

12. Plaintiff objects that he has "several severe medical conditions" that were deliberately ignored by defendants. Medical information given by plaintiff when he was booked on December 28, 2005, was that he had asthma and that his right shoulder was hurt. No other medical problems were noted. However, plaintiff submitted a Medical Request that same day, saying he needed not only his asthma inhaler, but medication for staph infection, high blood pressure and "trigarmonis." The BCDC doctor, Dr. Mullins, examined plaintiff the next day and found no staph infection, no evidence of asthma, and low rather than high blood pressure. Dr. Mullins prescribed a medication for "Trichimonas."

On January 5, 2006, Dr. Mullins again saw plaintiff, for complaints of leg pain from falling down stairs. Plaintiff was uncooperative in the physical exam, and Dr. Mullins believed that he was malingering.

On January 30 and 31, 2006, Dr. Mullins treated plaintiff for what plaintiff thought was a blood clot in his left leg, but what proved to be some swelling of the left calf and a bruised ankle.

On February 16, 2006, Dr. Mullins found "very mild asthma," and "some discomfort in the left hip" that did not appear serious.

On March 7, 2006, Dr. Mullins saw plaintiff for back and leg pain. Plaintiff was uncooperative, and Dr. Mullins found he had exaggerated his symptoms, had a "bad attitude," and was "very

negative."

On April 24, 2006, Dr. Mullins saw plaintiff for complaints of high blood pressure, dizzy spells, and blood in his urine. Plaintiff's blood pressure was normal. Urine was taken for analysis.

On May 4, 2006, Dr. Mullins saw plaintiff for complaints of left shoulder pain and a knot in his back. No specific problem was found.

On May 5, 2006, the response on a Medical Request to see the doctor for "pain & blood pressure & hypertension" was "Dr. reviewed your record and states "He has already examined you." Will not see you for the same complaints over and over again. You are abusing the medical system."

On May 23, 2006, Dr. Mullins saw plaintiff with complaints that plaintiff wanted his "special shoes" and had bleeding from his buttocks. No such bleeding was found, and Dr. Mullins was going to look into the issue of the special shoes, although noting that "[h]e's been in here since December and this is the first time that he's made any request for special shoes."

On May 30, 2006, Dr. Mullins saw plaintiff for complaints of bleeding from his penis. No bleeding was found. Plaintiff also asked for a midnight snack and complained of a staph infection in his leg, back pain, and a lost filling in his tooth. No infection was found, and a straight leg raising test was negative. Dr.

Mullins opined that plaintiff was a "just a hypochondriac" and might be seeking drugs.

On July 6, 2006, Dr. Mullins saw plaintiff again about the issue of the special shoes. Plaintiff said his back was "killing him." Dr. Mullins told plaintiff that he did not need shoes, and, after plaintiff walked out in mid-consultation, noted "[h]e definitely has a very negative attitude and always has multiple complaints but nothing serious."

There are no doctor's notes after this point, although the record reflects that plaintiff was allowed the use of his asthma inhaler through mid-August. There is no explanation for why the medical record stops where it does. The absence of any records is not, however, evidence that serious medical problems were being ignored. None of the medical problems asserted by plaintiff during the period covered by the medical record proved to be particularly serious, and plaintiff does not identify any others. This objection will be overruled.

13. Finally, plaintiff objects that 255 days in isolation is excessive, and constitutes cruel and unusual punishment. If it were the case that plaintiff had been held in isolation for that period of time as punishment for any one infraction of the rules, the Court would agree with him. However, the evidence reflects that plaintiff continually and repeatedly violated BCDC rules and regulations, leading to numerous short lock downs, which added up

to a lot of time in isolation.  There is no evidence that this was a situation outside of plaintiff's own control.  For this reason, the Court finds this final objection without merit, and it will be overruled.

14.  Because plaintiff made a timely demand for jury trial in this matter, those issues as to which summary judgment is not granted will be scheduled for jury trial at the Court's convenience.

**IT IS THEREFORE ORDERED** that plaintiff's **Motion To Sue Defendants In Both Capacity's [sic]** (document #60) is **granted.**

**IT IS FURTHER ORDERED** that plaintiff's **Objections To Recommendations Of Summery [sic] Judgment By Defendant** (document #61) are **sustained in part and overruled in part**.  The Objections are sustained to the extent they object to the R&R as it pertains to plaintiff's claims that he was denied rights to exercise, make telephone calls, and have visits.  The Objections are overruled as to all other issues.

**IT IS FURTHER ORDERED** that the **Report And Recommendation Of The Magistrate Judge** (document #56) is adopted in part, and that defendant's **Motion For Summary Judgment** (document #43) is **granted in part and denied in part**.  All issues raised by plaintiff -- other than his claims that he was denied rights to exercise, make telephone calls, and have visits -- are **dismissed with prejudice.**

Plaintiff's claims that he was denied rights to exercise,

make telephone calls, and have visits will be set down for jury trial.

**IT IS SO ORDERED.**

                                                        <u>**/s/ Jimm Larry Hendren**</u>
                                                        **JIMM LARRY HENDREN**
                                                        **UNITED STATES DISTRICT JUDGE**